# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

ROD M. DOUGLAS,

          Plaintiff,    :    Case No. 3:15-cv-170

  - vs -                          Magistrate Judge Michael R. Merz

ABF FREIGHT SYSTEM, INC.,

          Defendant.    :

## DECISION AND ORDER

This case is before the Court on Defendant ABF Freight Systems' Motion for Summary Judgment (ECF No. 15).

Under S. D. Ohio Civ. R. 7.2(a)(2), Plaintiff's opposition to the Motion was due to be filed by July 25, 2016, but none was filed. On August 12, 2016, Plaintiff filed a Motion for extension of time to respond which the Court denied for failure to comply with S. D. Ohio Civ. R. 7.3 (ECF No. 18). Plaintiff then filed a Second Motion for extension (ECF No. 19) supported by his Affidavit which detailed his own and family medical issues beginning in March 2016 and requesting a two-week extension (i.e. until September 13, 2016) to file a response. Defendant opposed the Motion, noting that a motion for extension based on the facts in Plaintiff's "unsigned and unnotarized affidavit" could have been filed any time before the July 25, 2016, due date (Memo in Opp., ECF No. 21, PageID 536). Defendant is also concerned that granting the extension could compress the Court's time for deciding the Motion for Summary Judgment.

1

As of the date of this Order, Plaintiff has not filed a reply to these arguments. Nor has Plaintiff tendered an opposition to the Motion, although the requested extension would have expired by now if it had been granted.

Plaintiff has not shown excusable neglect within the meaning of Fed. R. Civ. P. 6. The Second Motion for Extension of Time is DENIED.

Because a decision on a motion for summary judgment can result directly in the entry of judgment for the moving party, failure to file an opposition is not per se a basis for granting the motion. S. D. Ohio Civ. R. 7.2.

Because this case was referred on the unanimous consent of the parties (ECF No. 9, 10), the Magistrate Judge is to decide the Motion, rather than recommend a decision to a District Judge.

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis in original).  Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law.  Fed. R. Civ. P. 50).  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).  If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate.  *Id*.  The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp*., 964 F.2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis.  *Hartsel v. Keys*, 87 F.3d 795 (6th Cir. 1996).  "On summary judgment," moreover, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Thus, "the judge's function is

3

not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323; *see also, Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.*, 968 F.2d 606 (6th Cir. 1992).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

The facts set forth in this Report are admitted or established by evidence competent under Fed. R. Civ. P. 56(c) and not controverted by opposing competent evidence.

4

# FACTS

The facts of this case, for the purposes of the present Motion, are as follows.

Defendant ABF Freight Systems, Inc. ("ABF") is involved in several businesses and the business for which Plaintiff Rod M. Douglas ("Mr. Douglas") worked is a "less-than-a-truckload freight company."  (Deposition of Rod M. Douglas, ECF No. 17, PageID 256 (Depo. at 136-37).)  Mr. Douglas, who is African-American, worked at ABF's Dayton, Ohio, terminal which is one of ABF's larger terminals although not the largest. *Id*. at PageID 225; 256 (Depo. at 12; 137).

In October 1991, Mr. Douglas began working for ABF as a casual, part-time employee at ABF's Dayton terminal. *Id*. at PageID 225 (Depo. at 13). Mr. Douglas began working full-time in November 1992 and he worked at ABF for 25 years. *Id*. at PageID 253, 233, 254, 306, 310, 317 (Depo. at 125, 44,127, 334, 351, 381). ABF's Dayton facility is unionized and Mr. Douglas joined the Teamsters Local Union 957. *Id*. at PageID 256 (Depo. at 136). While he was employed by ABF, Mr. Douglas primarily worked the second shift 4 p.m. to 12 a.m., Sunday through Thursday. *Id*. at PageID 234 (Depo. at 47-48). One of the things that motivated Mr. Douglas to work second shift was the availability of overtime. *Id*. at PageID 253 (Depo. at 123).

At first, Mr. Douglas worked on the dock as a "checker," which involved unloading and transferring freight from inbound trailers to outbound trailers. *Id*. at PageID 256 (Depo. at 136). Mr. Douglas eventually obtained a job working in the yard where ABF stored its trucks and his job assignments varied and included  "put and pull," "stringer," and fueling incoming vehicles. *Id*. at PageID 256-257 (Depo. at 137-40). Mr. Douglas preferred to work in the yard over the dock and usually got to choose his assignments based on his seniority. *Id*. at PageID 257-258 (Depo. 141-42).

Mr. Douglas considered himself to be an excellent worker, good at his job, and he always

stayed on task, made few errors and corrected an error when he did make one, received good feedback about his job performance, and completed his job assignments in a timely manner. *Id*. at PageID 302 (Depo. at 318); PageID 258-259 (Depo. at 143-46).

During his years with ABF, beginning shortly after he was hired, Mr. Douglas made numerous complaints about his employment situation including allegations of race discrimination and harassment. *Id*. at PageID 259 (Depo. at 148). Mr. Douglas admits that over time and in response to his complaints, he had several telephone conversations and in-person meetings with ABF's director of human resources, Dan Griesse. *Id*. at PageID 255, 262, 263 (Depo. at 130, 158-61, 162).

Mr. Douglas' various complaints about his employment conditions at ABF included a December 2006 complaint in which Mr. Douglas and several other ABF employees alleged that supervisor, Todd Hanson, engaged in racial discrimination and harassment activities. *Id*. at PageID 260-61 (Depo. at 152-54). Mr. Douglas acknowledges that ABF responded to that complaint and its response included sending a member of its legal team and Mr. Griesse to the Dayton terminal to meet with the complaining employees, including Mr. Douglas. *Id*. Although the results of the investigation did not support the employees' allegations that Mr. Hanson had engaged in discriminatory behaviors, they did show that Mr. Hanson may have sometimes used poor management techniques and made mistakes in the application of seniority (Declaration of Daniel Griesse, ECF No. 15, Att. 1, PageID 195-96).

In January 2012 Mr. Douglas complained that supervisor Steve Long, a Caucasion male, instructed him to move to a "stringing" job and although Mr. Douglas did not tell Mr. Long, Mr. Douglas considered stringing a less desirable assignment  (Depo of Douglas, ECF No. 17, PageID 272-82, (Depo. 198-240)). Mr. Douglas alleged that Mr. Long failed to first move a

junior employee as required by the Collective Bargaining Agreement (CBA) and that when he objected to his assignment to stringing, Mr. Long said, "I'm your boss and I'm ordering you to." *Id*.

Mr. Douglas requested a meeting with ABF management personnel to discuss his allegations about Mr. Long. In response, Operations Manager Rick West, a Caucasion male, met with Mr. Douglas and union steward Kim Summerlin, an African-American, to discuss Mr. Douglas' interaction with Mr. Long. *Id*. At the meeting, Mr. Douglas alleged that Mr. Long was not assigning work in accordance with the CBA, that he routinely upgraded junior employees after Mr. Douglas, and that he intentionally gave Mr. Douglas the most difficult assignments. *Id*. However, Mr. Douglas acknowledges that he was one of the best workers on his shift and that it would make sense for Mr. Long to give him the more difficult assignments. *Id*. Mr. Douglas claims that while at that meeting, at one point Mr. Long interrupted him and said, "I'm your boss." *Id*. Mr. Douglas alleges that the term "boss" has racial undertones suggestive of slavery. *Id*. at PageID 288(Depo. at 245). Mr. Douglas conceded at his deposition that Mr. Long never assigned him work in violation of the CBA and that Mr. Long had also moved Caucasion employees between work assignments. *Id*. at PageID 279, 282(Depo. at 227, 240).

A follow-up meeting was held on January 19, 2012, with Mr. Douglas and Mr. Summerlin at which time Terminal Manager Tim Magoto, a Caucasion male, reminded Mr. Douglas that supervisors had the right to give him work assignments and that he needed to perform those assignments unless he thought the assignment violated the terminal's work rules in which case Mr. Douglas should pursue the grievance process. *Id*. at PageID 286-87 (Depo. at 257-59).

Mr. Douglas' next complaint of discrimination involves a March 2, 2012, incident in

7

which he took a tractor to the maintenance shop for repairs. *Id*. at PageID 307-09 (Depo. at 340-48). Supervisor Brendon Staton, a Caucasion male, eventually determined that it would take time to repair the tractor and he instructed Mr. Douglas to leave the tractor and go to his next assignment. *Id*. At some point, Mr. Staton returned to the area where the tractor was parked and Mr. Douglas asked him, "Why are you following me around? I do my job without supervision. I'm never not busy unless I'm on my break." *Id*. Mr. Staton responded to Mr. Douglas, "I'm going to make sure you stay busy." *Id*. Mr. Douglas accused Mr. Staton of following him and harassing him because of his (Mr. Douglas') race which accusation Mr. Staton denied. *Id*. Subsequently, at a meeting with Mr. Douglas, union steward Greg Warden, and Operations Manager Rick West, Mr. Douglas told his version of the incident. Mr. West offered to sit down with Mr. Douglas and Mr. Staton to work through the issue, but Mr. Douglas declined the offer. *Id*. at PageID 310 (Depo. at 352).

Mr. Douglas has also made several discrimination-related allegations about his various work assignments. Mr. Douglas claims that from the beginning of his full-time employment with ABF in 1992, he has received less favorable and/or more demanding work assignments on the dock than his Caucasion peers. *Id*. at PageID 303-04 (Depo. at 324-29). Mr. Douglas acknowledged that when he complained, ABF explained that the assignments were by way of a computerized dock management system and based on ABF's needs. *Id*. Although Mr. Douglas claims that he believes the computerized system can be manipulated for purposes of making assignments, he admitted that he has no evidence to support that claim or to contradict ABF's explanation of how assignments are made. *Id*. at PageID 304 (Depo. at 326-27).

Mr. Douglas also claims that he was subjected to heightened job-performance inspection, was singled out for additional work while his Caucasion peers were inactive, and that he, along

with other African American co-workers, were required to clock in and out for breaks while Caucasions were not required to do so. However, Mr. Douglas admits that supervisors were responsible for making sure trailers were loaded in a timely fashion, especially when drivers were on the clock waiting to leave which required them to pay close attention to employees' activities. *Id*. at PageID 306-07 (Depo. at 333-34). Additionally, having already admitted that he was one of the best workers at ABF, (*Id*. at PageID 258 (Depo. at 144)) Mr. Douglas acknowledges that if he received more work assignments that others, it may have been due to the speed with which he completed the assignments. *Id*. at PageID 305 (Depo. at 330-33). Finally, Mr. Douglas is not able to identify any Caucasion employees whom he believes were not required to clock in and out for breaks. *Id*. at PageID 306 (Depo. at 336).

Mr. Douglas claims that on several occasions ABF offered overtime to less senior Caucasion employees in violation of the CBA. However, Mr. Douglas acknowledges that while he could have, he did not always file a grievance to challenge that. *Id*. at PageID 269-72 (Depo. at 189-98). Mr. Douglas acknowledges that when he did file a grievance, ABF paid him if the union found in his favor. *Id*.

Mr. Douglas alleges that he frequently complained to both the union and ABF about the presence of racial graffiti on the walls in the restroom at the Dayton facility. *Id*. at PageID 263-69 (Depo. at 163-89). In July 2005, after Mr. Douglas reported the presence of racial graffiti on the walls, ABF scheduled dock meetings with employees on all shifts to reinforce ABF's prohibition against racial graffiti. *Id*. Mr. Douglas attended at least one of those meetings. *Id*. In August 2005, employee Dan Trick, a Caucasion, reported finding racial graffiti on a bathroom wall and ABF promptly removed it. *Id*. Mr. Douglas acknowledges that was the right thing to do. *Id*.

In September 2013 Mr. Douglas received four warning letters after he was absent four days of work and failed to present a doctor's note to excuse his absence for all four days. *Id.* at PageID 290-91 (Depo. at 270-76). Although Mr. Douglas objected to receiving four separate letters, he admits that there is nothing in the CBA that prevented ABF from issuing those letters. *Id.* Mr. Douglas acknowledges that ABF has issued warning letters for unexcused absences to Caucasion employees. *Id.* at PageID 300 (Depo. at 312-13). In addition, although Mr. Douglas filed a grievance about the warning letters, he did not prevail. *Id.* at PageID 292 (Depo. at 278-81).

Mr. Douglas claims that ABF's hiring practices have assured a low percentage of African American employees at its Dayton terminal. However, Mr. Douglas admits that ABF's management team has encouraged him to recommend African Americans for employment and that it has hired some he has recommended including his son, daughter, nephew, and a friend. *Id.* at PageID 285-86, 311, 316 (Depo. at 252-55, 354, 375).

Mr. Douglas has also raised claims of discrimination as to incidents which allegedly occurred when he was not present (Mr. T. cut-out incident), incidents involving other ABF employees (Evelyn Smith, Zarion Malik Douglas), and incidents to which ABF promptly responded (Barak Obama mask).

On or about March 14, 2014, Mr. Douglas filed a charge of race discrimination and retaliation with the EEOC which included allegations of discrimination (Depo. of Douglas, ECF No. 17, PageID 298-99 (Depo. at 305-07). The EEOC investigated Mr. Douglas' charge and determined there was insufficient evidence to establish that ABF engaged in race discrimination or retaliation. *Id.* at PageID 301 (Depo. at 314-17). The EEOC issued a notice of right to sue on November 12, 2014, giving Mr. Douglas ninety days within which to file suit. *Id.*

In April 2015 Mr. Douglas learned that he was required to take medication to control his blood sugar. *Id*. at PageID 247 (Depo. at 100-02). Mr. Douglas' physician suggested to him that stress could be exacerbating his medical condition but Mr. Douglas decided to continue working almost seven days per week for several months and he did not reduce his hours significantly. *Id*. at PageID 248-49 (Depo. at 106-07). However, on December 15, 2015, Mr. Douglas voluntarily retired from ABF. *Id*. at PageID 247-51 (Depo. at 100-14).

# Analysis

**Title VII Claim**

Mr. Douglas filed this action in the Court of Common Pleas, Montgomery County, Ohio, on April 6, 2015 (ECF No. 1, Att. 1, PageID 6-23); (ECF No. 2, PageID 27-43). On May 8, 2015, ABF removed the matter to this Court on the basis of diversity of citizenship and federal question jurisdiction as to Mr. Douglas' Title VII claim (ECF No. 1, PageID 1-5). In his Complaint, Mr. Douglas has raised claims for racial discrimination-hostile work environment in violation of Title VII of the Civil Rights Act of 1964, Title I of the Civil Rights Act of 1991, and Ohio Revised Code § 4112.02, et seq. and for negligent hiring and retention (ECF No. 2, PageID 25-43).

The EEOC right-to-sue letter is dated November 12, 2014 (ECF No. 17, PageID 301, Depo. at 315-17 (Depo. Ex. 20, PageID 508)). Mr. Douglas had ninety days from receipt of that letter to file suit. There is a rebuttable presumption that an individual receives a right-to-sue letter

11

"on the fifth day following mailing by the EEOC." *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557-58 (6th Cir. 2000). Therefore, it is presumed that Mr. Douglas received the right-to-sue letter on November 17, 2014, and he has offered no rebuttal. Therefore, he had until February 15, 2015, to file suit. However, Mr. Douglas did not file suit until April 6, 2015, some fifty-two days later. Although the statute of limitations for Title VII claims is subject to equitable tolling, Plaintiff has offered no facts in support of tolling. Accordingly, Mr. Douglas' racial discrimination claims under Title VII are time-barred.

**Ohio Law Claims**

The Ohio Supreme Court has recognized that federal law interpreting Title VII claims applies equally to state law claims brought under Chapter 4112. *Little Forest Med. Ctr. v. Ohio Civil Rights Comm.*, 61 Ohio St.3d 607 (1991). To establish a claim for hostile work environment based on race under Ohio law, Mr. Douglas must show, by a preponderance of the evidence that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with his work performance and creating an objectively intimidating, hostile, or offensive work environment; and (5) ABF is liable for the harassment. *Kuhn v. Washtenaw County*, 709 F.3d 612, 627 (6th Cir. 2013)(citation omitted). Under Ohio law, a claim for hostile work environment on the basis of race is subject to a six-year statute of limitations.

Ohio has a six-year statute of limitations for race discrimination claims arising under Ohio law. *Cosgrove v. Williamsbury of Cincinnati Mgt. Co., Inc.*, 70 Ohio St.3d 281, 282

(1994)(Ohio Revised Code § 4112.99 is a remedial statute, and is thus subject to Ohio Revised Code § 2305.07's six-year statute of limitations). Therefore the incidents of alleged racial discrimination occurring before April 6, 2009, are not actionable.

To be actionable under federal or Ohio law, the racial hostility must permeate the work environment with discriminatory behavior sufficiently severe to alter the conditions of employment. *Waldo v. Consumer Energy Co.*, 726 F.3d 802 (6th Cir. 2013). In determining whether a hostile environment existed, the court must consider all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 23 (1993). Both an objective and subjective test must be applied; the conduct must have been severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as having been abusive. *Harris*, 510 U.S. at 21-22. Isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 790 (6th Cir. 2000). The incidents testified to by Plaintiff in his deposition would not be sufficient to support a verdict for a hostile work environment and Plaintiff has named no other witnesses who could so testify at trial.[1]

Plaintiff has failed to show that many of the incidents of which he complained in his deposition had any possible racial component in that they were actions properly taken by supervisors, sometimes upheld by the union grievance process. The incident in which supervisor

---

[1] The Court's Scheduling Order of August 7, 2015 (ECF No. 11), required identification of lay witnesses for trial by March 26, 2016, but Plaintiff never filed a list of witnesses.

Long gave as a reason why Douglass had to accept an order from Long because "I'm your boss" is not racially derogatory.[2] Long tried to apologize and Douglas refused to accept that apology.

ABF is also not liable on a respondeat superior basis for any racially-motivated behavior by Douglas' co-workers as it had a clear promulgated anti-harassment policy and responded promptly to Douglas' complaints when he raised them.

With respect to Douglas' claim against ABF for negligent hiring and retention, ABF's position is also well-taken. Ohio law requires a plaintiff in such a case to prove (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's knowledge of the employee's incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries. *See Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 69 (1982). Douglas has not produced sufficient competent evidence on any of these elements to survive a directed verdict. A plaintiff must also be able to establish a tort claim against the employee to hold the employer liable for negligent hiring and retention. See e.g., *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 517 (6th Cir. 1999) (citing *Strock v. Pressnell*, 38 Ohio St.3d 207, 217 (1988)). Douglas had not made out a prima facie case of such a tort.

**Conclusion**

The Court concludes that there are no genuine issues of material fact made out by the evidence before the Court and Defendant is entitled to judgment as a matter of law. ABF's

---

[2] "Boss" is colloqial English for person in authority over another employee. Had Long said, for example, "I'm your overseer," a far different case would be made.

Motion for Summary Judgment is GRANTED. The Clerk will enter judgment dismissing the Complaint with prejudice.

September 20, 2016.

s/ *Michael R. Merz*<br>United States Magistrate Judge